UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MICHAEL J. CHRISTOFF,
derivatively on behalf of Galexa,
Inc., a Florida corporation,

    Plaintiff,

v.                              Case No.:  2:20-cv-546-SPC-NPM

PAUL INGLESE, NORTHSTAR
TECHNOLOGIES GROUP, INC.
and GALEXA, INC.,

    Defendants.
_____/

## OPINION AND ORDER[1]

Before the Court is Plaintiff Michael Christoff's Motion for Partial Summary Judgment. (Doc. 187). Defendants Paul Inglese and Northstar Technologies Group, Inc. have responded (Doc. 198), and Christoff has replied (Doc. 200). For the following reasons, the Court denies the Motion.

## BACKGROUND

Because the Court writes for the parties, it assumes familiarity with the facts and writes only those necessary for resolving the parties' motions. Unless

---

[1] Disclaimer: Papers hyperlinked to CM/ECF may be subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them. The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

otherwise noted, the parties either agree on these facts or they were undisputed in the record.

This case is about a business arrangement gone wrong. There are four major players: (1) Christoff, (2) Inglese, (3) Chuck Ardezzone, and (4) Dave Tingley. Ardezzone and Tingley started Boxville, LLC, Defendant Galexa's predecessor. Boxville sought to use shipping containers for new construction projects like tiny homes. Christoff invested in Boxville. When Inglese started working with Boxville, he allowed it to use what he says is his technology, namely Gen 5. Gen 5 is a construction material—a fiberglass embed anchor/connector for use with precast concrete. (Doc. 187-2 at 103:8-12, 283:18-284:12).

Boxville later changed names and transitioned to three companies dedicated to building with composite materials: Black Swan, Rhino, and Galexa. It was envisioned that Black Swan would own any intellectual property ("IP") and license it to Rhino who, in turn, would license it to Galexa. Inglese assigned some IP to Black Swan, but exactly what is contested. (Doc. 187-3). Inglese says he assigned only Gen 5, but Christoff says he assigned more IP. (Doc. 187-2 at 103:5-106:16; Doc. 187-3). Nevertheless, the licenses from Black Swan to Rhino to Galexa never happened. In fact, Black Swan and Rhino functioned very little, if at all. Galexa ran the show.

Ardezzone, Tingley, and Inglese all worked at Galexa. Ardezzone was a shareholder and Chief Executive Officer, and Tingley was a shareholder and Chief Financial Officer. But Inglese's exact involvement at Galexa is unclear and the heart of this case.

It is undisputed that Inglese was a Galexa shareholder and later CEO. But Inglese was always paid as an independent contractor of Boxville and Galexa. (Doc. 187-2 at 118:2-20). And independent is how Inglese portrays himself. (Doc. 187-2 at 118:2-122:23, 126:5-14, 127:13-129:15, 135:20-137:12). According to Inglese, Ardezzone and Tingley ran Galexa, while he focused on getting Florida Product Approval for another composite building component/system that he created before Galexa but let Galexa use. This IP was called Gen 6. Christoff, however, tells a different story. He says Inglese was always an officer of Galexa and invented Gen 6 while working with Galexa.

For Christoff's involvement, he was a Galexa shareholder and invested money in the company. Pertinent here, Christoff invested $100,000 in Galexa and, as collateral if Galexa defaulted, Tingley signed an agreement giving Christoff[2] Black Swan's IP. (Doc. 187-14). It's unclear if Inglese or Ardezzone knew about the collateral agreement when Christoff and Tingley signed it.

---

[2] The Pledge and Security Agreement states the agreement is made in favor of Capital Funding, LLC. No one really knows what Capital Funding, LLC is, and it is likely a scrivener's error by Christoff's drafting attorney.

3

Fast-forward about six months. Tingley resigned as Galexa's CFO. A few things then happened in quick succession. Christoff believed that Galexa defaulted on the collateral agreement, so he claimed to own whatever IP that Black Swan and Galexa owned and assigned it to another of his companies. Inglese said that's when he first learned about the collateral agreement. (Doc. 187-2 at 151:22-152:20). He claimed that Tingley had no authority to make the collateral agreement and thus believed it to be fraudulent.

During this time, Inglese became the CEO of Galexa for about two weeks. He says he did so to save Galexa, straighten out the finances and paperwork, and protect his IP. Upon discovering the collateral agreement, Inglese called an emergency meeting of shareholders, and they voted to report the collateral agreement as fraudulent to the police.[3] Inglese then soon resigned from Galexa and gave his shares to Ardezzone. On Inglese's last day as CEO, Inglese and Ardezzone signed an agreement terminating Black Swan's rights to any of Inglese's IP. (Doc. 198-9). Ardezzone let Inglese download personal files from Galexa's G Suite Drive and Share Drive. (Doc. 198-11). Christoff alleges Inglese took not just his personal files, but much more.

---

[3] Galexa reports it to police, and, at most, some investigation took place but nothing further.

4

Shortly after Inglese resigned, he started Northstar Technologies Group, Inc. and Northstar Building Systems, LLC (collectively, "Northstar").[4] Although Northstar also works with composite building system(s), Inglese says Northstar's technology is different from Galexa's. (Doc. 198-13). He calls Northstar's technology Gen 7. (Doc. 187-13 at 90:15-19). Inglese says he licensed Gen 6 to Galexa when he first resigned so Galexa could keep building but later terminated that agreement. (Doc. 187-2 at 55:4-57:12, 282:16-283:7).

Christoff now sues Inglese, Northstar, and Galexa derivatively on behalf of Galexa. (Doc. 183). He asserts four claims, two of which are at issue here. The pertinent claims are for declaratory relief (Count III) and breach of fiduciary duty (Count V). In Count III, Christof seeks the Court to declare that Inglese has no rights to any IP Galexa developed (including Gen 6 and any related IP rights), or any other IP Inglese assigned to Galexa. In Count V, Christoff maintains that Inglese breached fiduciary duties he owed to Galexa, its shareholders, and officers. So, after years of litigation and discovery, Christoff moves for partial summary judgment on Counts III and V.

---

[4] Northstar Technologies Group, Inc. is a technology development company and a named defendant. Northstar Building Systems is the related general contractor and manufacturer, and not a named party. (Doc. 187-2 at 24:18-29:13).

**LEGAL STANDARD**

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply say, "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*,1115-16 (11th Cir. 2019) (internal quotation marks and citation omitted). At this stage, courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

For issues the movant must prove, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citation omitted). But for issues the non-movant bears the burden, the movant has two options: (1)

6

point out a lack of evidence to support the nonmoving party's case; or (2) provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. In Green and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (citation omitted). "The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).

## DISCUSSION

The crux of this case is determining what IP exists, when it was invented, and who owns it. To make these determinations, the Court must wade through competing stories, shift through often sloppy documents, and weigh credibility. But, at this summary judgment stage, the Court cannot make these credibility decisions or weigh the evidence. *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010). And the Court would need to do exactly that to decide whether the legal principles referenced in the parties' papers apply here. In other words, without resolving factual disputes, the Court cannot decide—as a matter of law—whether Christoff is entitled to declaratory relief or whether Inglese breached his fiduciary duties. The Court expands on why below.

Before declaring that Inglese has no rights to any IP Galexa developed (including Gen 6 and any related IP rights), or any other IP Inglese assigned to Galexa, the Court needs to know: (1) what IP (if any) Inglese developed before Galexa started, (2) what IP Inglese invented while with Galexa, (3) his role at Galexa when any IP was invented there, and (4) the validity and substance of the relevant IP assignments/terminations and the collateral agreement. These facts also need to be decided before determining the related question of whether Inglese breached his fiduciary duty. And the record is unclear.

Christoff argues that Inglese developed at least Gen 6 while at Galexa. He has evidence for this. In numerous emails, Inglese wrote things like "Galexa started research and development of a proprietary composite building system." (Doc. 187-8; Doc. 187-11; Doc. 187-13 at 7:9-10:3, 32:15-34:25, 42:4-45:9; Doc. 198-2 at ¶ 4). While Inglese worked with Galexa, Gen 6 obtained Florida Product Approval and a provisional patent. (Doc. 187-2 at 284:13-23; Doc. 187-13 at 47:2-48:18). And Christoff says he's unsure what, if any, other IP Galexa had because Inglese improperly removed electronic files from Galexa's drives.

Inglese offers a different narrative. He claims he invented both Gen 5 and Gen 6 before Galexa. (Doc. 187-2 at 243:4-244:2). Although Inglese admitted to "developing" Gen 6 while at Galexa in emails, he later explained

8

his word choice at his deposition. Inglese testified that by "developing" Gen 6 he only meant getting Gen 6 ready for marketing and the Florida Product Approval process. (Doc. 187-13 at 7:9-10:3, 32:15-34:25, 42:4-45:9; Doc. 198-2 at ¶ 4). And there's evidence like product drawings to support Inglese's story that he had Gen 6 before Galexa. (Doc. 198-3; Doc. 198-4).

With the question of when Gen 6 was invented unresolvable at summary judgment, the Court cannot apply potential relevant legal principles to determine judgment as a matter of law. For example, Christoff states, "As a matter of law, a company has an equitable right to the patents and patent applications developed by an officer *who had a fiduciary relationship with the plaintiff company at the time the relevant inventions were developed*, and the applications filed." (Doc. 187 at 20) (emphasis added). This may be true, but the parties hotly contest when Gen 6 was developed and the similarity of Gen 7. Indeed, Inglese says Gen 7 is different from Gen 6, but Christoff argues otherwise. The parties also debate Inglese's role at Galexa.

Further, the Court would need to determine the substance and meaning of any IP assignments to Black Swan to decide the requested counts as a matter of law. While the parties agree Inglese assigned some IP to Black Swan, the parties debate what IP. Inglese says he only assigned Gen 5. But Christoff says Inglese assigned more, including Gen 6. To complicate matters, it's undisputed Black Swan never licensed IP to Galexa, even if this was the intent

9

of the companies' founders. Inglese asserts he provided Galexa only a license to use his IP. Inglese then terminated any assignment to Black Swan on his last day at Galexa, which Christoff alleges was improper.

What's more, there are material factual issues about the collateral agreement through which Christoff says he obtained Black Swan and/or Galexa's IP.[5] Christoff says the collateral agreement was valid, Galexa defaulted, and thus he owns Galexa's and Black Swan's IP. Inglese challenges the validity of the agreement and Christoff's assertion that Galexa defaulted. And what meaning any of this has depends upon what IP Black Swan and Galexa had.

At bottom: this is a complicated, fact-intensive case unfit for summary judgment. The Court simply cannot resolve the genuine issues of material fact necessary to decide Counts III and V as a matter of law. The Court thus denies Christoff's partial motion for summary judgment and refers this case to the assigned magistrate judge for a settlement conference.[6] And to facilitate the

---

[5] This is not the only way Christoff argues he gets Galexa's and Black Swan's IP (if they own any): after the collateral agreement and after Inglese resigned, Christoff on behalf of his company Rampart, and Ardozzone on behalf of Galexa, signed separate agreements assigning Rampart Galexa's and Black Swan's IP (if they own any). (Doc. 187-19). But this also rests on what, if any, IP Galexa and Black Swan had.

[6] A status hearing on June 10, 2022, the parties agreed to Judge Mizell conducting settlement conference(s) following summary judgment. (Doc. 186-1 at 95:6-25).

settlement conference, the Court will move the trial term to June and suspend the remaining pretrial deadlines.

Accordingly, it is

**ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment on Counts III and V (Doc. 187) is **DENIED**.

2. This case is **REFERRED** to United States Magistrate Judge Nicholas P. Mizell to conduct a settlement conference and issue any order deemed appropriate.

    a. All parties must attend the settlement conference as directed by Judge Mizell.

    b. On or before **April 7, 2023**, the parties must contact Wendy Winkel, Judge Mizell's courtroom deputy clerk, at 239-461-2053 to arrange for a mutually agreeable date and time for the settlement conference.

3. The Clerk is **DIRECTED** to reset this action for a bench trial in **the June 2023 trial term**. All remaining pretrial deadlines are **SUSPENDED** until further Court order.

**DONE** and **ORDERED** in Fort Myers, Florida on April 3, 2023.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:   United States Magistrate Judge Nicholas P. Mizell
Wendy Winkel, CRD
All Parties of Record